That brings us to our next case, which is Genius Group Limited v. LZG International. All right, and Ms. Santinelli, you have reserved three minutes for rebuttal. So that gives you seven to begin. Just give us one second so we can set the clock. You may proceed. May it please the Court, my name is Marjorie Santelli. I'm representing Appellant Genius Group. Could you move the mic so it will float? It's a little hard to hear you. Or we can lower the lectern if that's easier. So this case concerns dual injunctions in favor of arbitration. There's a dispute being arbitrated. There's an asset purchase agreement. Actually, a decision on the case is supposed to be issued by the end of the month. Nonetheless, here we are. So in this case, our client was to pay 73 million shares of stock to LZG for the purchase of an asset. That asset purchase is in dispute, and so both parties wanted rescission. So during the pendency of the arbitration, Genius sought an injunction to prevent dispersal and sale of those 73 million shares because he didn't think you won't be able to get them back from the shareholders. And in conjunction, there was an injunction on voting the shares in any shareholder meetings. Thereafter, about three months later, LZG came into court and accused Genius of weaponizing the injunction. That is, they're claiming that as soon as the ink was dry in the injunction and LZG could not vote its shares, it pivoted the company to this Bitcoin strategy, which meant that they were keeping the treasury in Bitcoin instead of cash. And also, they issued millions of shares of stock. They were part of a secondary public offering, actually. That secondary offering, your client consented to it? Our client, well, our client... Yes or no? Yes, actually. Yeah, the secondary public offering was an ATM. They filed for it. Yeah. And LZG also approved of it. So why would the implementation of a program that your client consented to be a change in the status quo? Or am I missing something? We didn't think it was a change in the status quo at all. I mean, I guess what LZG didn't like was the fact that their percentage of stock, the 73 million shares started off as maybe 40%, and as new shares were issued, their percentage shrank. But that was understood that that was going to happen. LZG voted the shares in favor of the ATM. LZG's members of the board approved it expressly. So this was expected. So we agreed that this was not a change in the status quo. Moreover, the whole Bitcoin strategy had nothing to do with shareholder voting. This was a decision by the board. It was issued the same day that the initial TRO was issued, but it was actually issued beforehand. They were in Singapore when they issued it. I don't think one had anything to do with the other. But the problem here was that the court, a lot of these facts were not presented to the court in terms of the fact that their claims about manipulation was pure baloney. But what was before the court was how much damage this was causing Genius. Genius was at a stage of its development where it was expanding, and the ATM, the monies from the secondary offering, were basically its primary way of operating. And I can say with confidence that if this court had not stayed that injunction, Genius would be bankrupt now. Well, can I ask a question? I mean, you mentioned the arbitration. The decision was supposed to come out this month. Is that going to move this whole thing? I suspect yes. There's another issue I thought it was important to raise, and LCG's motion to expedite oral argument was filed in December, where they're claiming that it's important. LCG is effectively locked out of exercising any of its contractually bargained for management and voting rights in Genius due to the district court's current injunction. So this was addressed at the district court level, but the injunction that remains in place doesn't curtail any of their voting rights. This was not done. I think it was done accidentally, but it was addressed at the district court. She claimed that she did not have jurisdiction to fix it, but when the court stayed the injunction against Genius, it wasn't really worth pursuing. So my point is that LCG does have and has had the right to vote its shares since March 13th. I don't know if this was ‑‑ I wanted to bring this up now so counsel could address it. So I don't know if there are further questions as to the severe damages this was causing Genius. Well, I guess I have one, which is no shares were in fact issued. Is that what happened?  Right. So no money was raised.  So they had bitcoin in the treasury, and this was going on in the district court. Well, LCG just said, well, pay with bitcoin. With no knowledge of whether they could pay with the bitcoin, it was in their public statements that they had so many bitcoin in their treasury. Well, to have bitcoin in the treasury, that can be converted into, like, real money, right? Right. So how was it the case that they couldn't pay their employees and so on? They did pay some of it of the bitcoin. Well, people were laid off, though, right? Right. So a lot of the bitcoin was not saleable. It was collateral for some loans. So the supposition that you can look at what's in the treasury and assume it can all be used to pay something was just not true. This was just based on speculation. They even speculated whether or not Genius actually had employees, which if you look at their public filings, it lists they had 133 employees in 2024. And this is just absurd that the Court would rely on these speculative statements as opposed to somebody with personal knowledge of what was going on. If you're satisfied. All right. Well, you've reserved three minutes for rebuttal, so now we'll hear from Mr. Cousett. Is it Cousett? Cousett, yes. Cousett. Thank you, Your Honor. Good morning, Your Honors. May it please the Court, Brian Cousett, venerable LLP, on behalf of the appellee, LZG International. I'd like to start briefly with kind of the overarching issue here, which is this is an abuse of discretion standard. They have to find an error of law. They haven't really identified one. The district court did not base its decision on any clearly erroneous factual findings. To the extent that they complained to the motions panel and are complaining here about the district court's balance of equities, that's a core exercise of judicial discretion, and it's clearly within the range of the permissible decisions here because what the district court decided is that if our client, LZG, cannot vote its shares or sell its shares, so it doesn't get the economic value of the shares or the intrinsic value of management control or participation, then during that time, while that injunction is in place, they shouldn't be able to fundamentally alter the company by, in this case, pivoting to a Bitcoin-first strategy. And I think that goes to Judge Jacobs, your question about the status quo. The briefing from... Wait a minute. The shares, the possession of these shares would have enabled your client to prevent moving to a Bitcoin-first strategy? It's a great question, Your Honor, and I think it's one that... I guess I'm curious of the answer. Yeah. I appreciate that. And it's one that the district court, I think, addressed at the oral argument. I think if you look at pages 851 to 254 of the record, this is discussed. Yeah, correct. But it just basically said, well, they might have been able to gripe about it, if they had the shares and voting power. But it's not clear to me that they had the authority to stop it. This is not something that required a shareholder vote, right? There's no dispute that it did not require a shareholder vote. But if you look at, to go back to the issue of the status quo that Judge Jacobs raised, the ICC arbitration that's at issue here started October 30th of 2024. This pivot to the Bitcoin strategy occurred November 12th, 2024, after that. So the status quo, the last peaceable status between the parties... The status quo, I mean, the dispute is over these shares, right? The underlying dispute in the arbitration is over whether we are entitled to these shares or whether we were fraudulently induced into entering into the asset purchase agreement. Right, but it's not the status quo of the company as it existed on the day that you had an arbitration, that the arbitration was called. Well, I think that if we're looking at the status quo, I think the status quo as of prior to the arbitration was the at-the-market financing had been approved, but, and this is the critical point, the at-the-market financing was being used for an educational technology business and for operations and not to be a Bitcoin treasury company. And the decision to make that shift was November 12th, 2024, after the arbitration had started, after they had come to the district court for an injunction. Are you maintaining that this is not just a question of, we've got a bunch of money that we're using for various operating purposes and we've decided to hold it in Bitcoin rather than in Deutsche Marks or some other real-world currency. You're saying, are you saying that this was such a radical shift that actually they were raising money so that they could speculate in the Bitcoin market and get out of being an ed-tech company altogether? So if you look at, we submitted a short supplemental appendix. It's page LZG009 in our appendix. It's the press release that Genius issued on November 12th, 2024. And it specifically states that they're going to spend $120 million of the $150 million at-the-market financing that they have access to to acquire Bitcoin. So I don't think it is the case where it is, we're going to have some Bitcoin in our treasury. It is the case that they shifted to use nearly all of the at-the-market financing that they had access to to purchase Bitcoin and hold Bitcoin, in that case to give public shareholders exposure to that asset. To go back to Judge Sullivan, to your point, you're right that the shareholder vote was not required. But Genius, when it first started this action in November of 2024, specifically said that our shares, the $73 million that my friend on the other side referred to, were a controlling block of stake in Genius. So I don't think it is correct to say that simply because it was not put up for a shareholder vote, if we had had access to and the right to participate in management and vote on a controlling block of stake, we could not have impacted that decision to pivot to Bitcoin, which was after the status quo ante here, before the last peaceable status that the parties had before this controversy arose. I'd also like to... So where are we now? Since this action was stayed, since that order was issued, they could take the money and go to Las Vegas with it, right? And if they put it in Bitcoin, it's in Bitcoin. And if they've issued shares, which they were entitled to do now, they've issued the shares and your stake has been diluted. Is that right? I think that that's certainly the case, at least to some extent. I think the question is kind of twofold, and I think this does fold into Judge Sullivan's prior question about mootness. Number one, I don't think that this is moot. I think my friend on the other side is right that we're expecting... We are not counsel to the... But once the decision from the arbitration, the arbitrators comes out, is there anything left to do at that point? Well, I think there may be, Your Honor. I mean, there's some period of time after the arbitrator decides and which goes through a process of the ICC, and then there's going to be confirmation or vacature proceedings. So I don't think that it's the case that's a month from now or whatever when the arbitrator rules, that's the end of the process if the award is vacated. So going back to your argument, basically, which is that you would have had input or would have been able to impact things, it seems to me what you're saying is that during the pendency of this arbitration, the court is going to be able to decide basically business judgment decisions by management. I mean, because otherwise they may jeopardize the value of this corporation for your client. I don't... So Bitcoin crosses a line, but if they just decide to invest or acquire some other company, that would be different? I do think it... I think that the issue here... I don't think that there's any dispute that there's business judgment that Genius has, and there's no suggestion that... So why is Bitcoin not just an exercise of business judgment? Well, I think the point that the district court made, which we think was correct and clearly not... not clearly erroneous, excuse me, was that this particular company was an educational tech company, and our... the deal that's at issue in the arbitration was for us to get a 50% stake, essentially, in that educational tech company. And now it's a shift, not from being really a tech company, but to being a Bitcoin treasury company, is a significant shift that would render our ability to get relief in the arbitration a formality, because the company on the other end of the arbitration is fundamentally different than what we invested in. So the... your answer to Judge Sullivan's question, I take it, is yes, it would be the same thing if instead of investing in Bitcoin, they had decided to take the money from the stock offering and buy a department store. I don't... Because then they would be changing the nature of the operating focus of the company. I think that would be a closer question. I think the key here is they completely shifted to kind of chase this market in Bitcoin. Well, they'd be chasing some other market. I mean, anything that reoriented the company would give rise to the same problem. This isn't just... you know, or are you saying, no, Bitcoin is special, and we should decide that this is somehow equivalent to flushing the money down the toilet? I don't think you need to decide that. I think that the issue here is that we have an abusive discretion standard, and if this... in this situation where we are, during the course of the arbitration, prevented from voting or participating, they shouldn't be able to use that situation to make fundamental changes to the business. I think it would be a closer question if it was a closer kind of acquisition to what their fundamental business was. I take your point about the department store analogy, and it's a good question. I think that here, a district court has the discretion to make a decision that, in a particular case, the balance of the equities favors freezing the status quo for purposes of the arbitration process, so that neither side, in this particular case, is prejudiced during that process. And at the end of the process, they're getting something that was completely at odds with what they thought they were getting when they did the deal that led to this arbitration. If there are no further questions, happy to rest on our papers. Thank you, Your Honors. All right. Thank you very much, Mr. Cousett. Ms. Santelli, we'll hear from you for three minutes of your time. I wanted to make the important point that what was... why Genius was on the verge of bankruptcy was not necessarily that they were prevented from putting their treasury in Bitcoin. They lost some contracts and they lost money from it, but the fact that they had this ATM to sell stock and they weren't allowed to sell any, all of a sudden, all of their funding was cut off, that's what put them on the verge of bankruptcy. And I don't think that putting a company... Am I just confused about the facts here? The money that Mr. Cousett said, and it seemed to me that this was what they were saying in the brief, is that shares were issued, but then the proceeds from those shares were not actually used to operate the company. They were shifted into Bitcoin. Oh, I mean, I think it was both. You know, the ATM passed, I think, in August, and then up until this injunction was issued, they totally funded the company with the ATM and, I assume, put the excess in the treasury in the form of Bitcoin. So after the injunction was issued and they could no longer issue stock, they delved into the Bitcoin, sold off some of it at a loss, sold off everything they could, and then they were laying people off. And that was, you know, that was what was causing... That's the big change in the status quo. I don't know what kind of injunction, you know... If the court had not stayed the injunction, the 73 million shares would be worth zero. I'm not sure what LZG, how they would have really benefited from this. Moreover, you know... So what has happened since the stay was issued? More shares have been sold? Yes, they went back to the ATM. It was actually renewed, something like that, yes. So they've been able to recover a lot of what they lost. So the company is not insolvent and it's not on the verge of bankruptcy. And has that impacted the arbitration at all? The remedies available to your adversary? I'm not really sure. We're not, you know, it's obviously the arbitration had... In other words, if their shares have been watered down, that's easily fixed by just giving them additional shares. Well, yes, if they had been entitled to a percentage rather than an amount of shares, surely, right, they could have just issued them more shares, but there was no agreement that it would be a percentage. Well, I mean, I guess I want to just ask you the same question that I asked Mr. Kucin, which is about whether or not the arbitration moots this. You thought it did. His thought was that it wouldn't, at least not initially, that it would take some time for the arbitration. You know, it may just depend on what the arbitrator says. If there's some decision that, you know, splits the equities, I don't know. Thank you. Thank you very much. Thank you both. We will reserve decision.